UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GREENPOINT TACTICAL
INCOME FUND, *et al.*,

        Plaintiffs,

                                 Case No. 20-cv-444-pp

    v.

ALLEN PETTIGREW,[1] and
DARREN CLAY HALVERSON,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (DKT. NO. 2)**

---

FBI Agents raided the plaintiffs' offices and homes on March 22, 2017, brandishing weapons and seizing documents, computers and other assets. Dkt. No. 1. The government did not charge the plaintiffs with a crime, returning all assets months later. Id. at ¶5. The plaintiffs filed a complaint under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), alleging that the defendants violated their civil rights "for the unlawful search and seizure of Plaintiff's homes, offices, private papers, information, communications, and belongings in violation of Plaintiffs' Fourth Amendment rights." Id. at ¶6.

The plaintiffs allege that FBI Special Agent Allen Pettigrew knowingly and intentionally made false statements in the affidavit filed in support of the

---

[1] The complaint spells Pettigrew's first name "Alan." The defendants assert that his first name is spelled "Allen." Dkt. No. 3 at 2.

1

search warrant. Id. at ¶3. The plaintiffs assert that Assistant United States Attorney Darren Halverson "intentionally, knowingly, and recklessly assisted Pettigrew in the preparing and filing of the false statement and representations or material omissions." Id.

The defendants seek dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, arguing that (1) no implied cause of action arises under Bivens in this context; (2) absolute immunity bars the claims against Halverson; (3) qualified immunity protects Halverson and Pettigrew; and (4) the plaintiffs failed to state a claim for damage to property. Dkt. No. 31. The motion is fully briefed, and on December 3, 2020 the court heard oral argument. Dkt. No. 15. The court will grant the motion.

## I.     Standard Governing Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). When evaluating a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct

2

alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 556).

## II.    Facts Alleged in the Complaint

### A.    The Parties

Plaintiff Greenpoint Tactical Income Fund, LLC is a private investment fund founded in 2013. Dkt. No. 1 at ¶9. It invests in asset classes, including rare gems and fine minerals, intended to hedge against fluctuations in more traditional asset classes. <u>Id.</u> Greenpoint has over 100 individual investors and maintains offices and a vault in Milwaukee. <u>Id.</u>

The other plaintiffs are affiliated with Greenpoint. GP Rare Earth Trading LLC (GP Rare Earth) is a wholly owned subsidiary of Greenpoint and the entity that holds the gem and mineral assets. <u>Id.</u> at ¶10. Greenpoint has two managing members: Chrysalis Financial LLC (Chyrsalis) and Greenpoint Asset Management II, LLC (GAM II). <u>Id.</u> at ¶9. Chrysalis, which is responsible for the day-to-day operations of Greenpoint and GP Rare Earth, is primarily managed by Christopher Nohl. <u>Id.</u> at ¶¶11. 13. GAM II, which is responsible for investor relations, is primarily managed by Michael Hull. <u>Id.</u> at ¶¶12, 14. Bluepoint Investment Counsel, LLC operates as an investment advisory firm providing services to Greenpoint, and is co-owned and managed by Michael Hull. <u>Id.</u> at ¶15.

Defendant Allen Pettigrew works for the FBI as a special agent in the Madison Resident Agency of the Milwaukee Division. <u>Id.</u> at ¶16. Darren

3

Halverson works as an Assistant United States Attorney in the Western District of Wisconsin. Id. at ¶17.

B.    The Search Warrant

The plaintiffs allege that in March 2017, Pettigrew and Halverson prepared warrant applications and affidavits that contained multiple false and/or deliberately misleading representations. Id. at ¶¶18, 19. The plaintiffs allege that Pettigrew and Halverson made the following statements "intentionally, knowingly and recklessly:"

- That offering materials sent to investors placed an "emphasis" on distressed real estate assets rather than gem and mineral assets, which may have misled investors about fund assets or the use of their investments. Dkt. No. 1 at ¶20. The plaintiffs allege that Pettigrew and Halverson had reviewed information, including investor emails and similar communications, that showed that investors were fully aware of the fund's investments in gem and fine mineral assets. Id.

- That paragraphs 18 and 20 of Pettigrew's affidavit suggested that a sampling of thirty appraisals obtained by Greenpoint were "purported to be completed by" James Zigras or William Metropolis but that they were unsigned, implying—falsely, according to the plaintiffs—that Zigras or Metropolis may not have completed the appraisals. Id. at ¶21. The plaintiffs allege that through the search warrant, Pettigrew had obtained access to the emails of Nohl (manager of Chyrsalis) and other employees involved in the valuation process and knew that Zigras and Metropolis had prepared the appraisals. Id.

- That the Pettigrew affidavit said the appraisal reports prepared by Metropolis (Metropolis prepared twenty-one of the thirty appraisal reports) "did not specify the valuation type for the fund" and therefore did not identify whether the appraisals were for fair market value or some other basis for valuation (such as replacement costs). Id. at ¶22. The plaintiffs allege that Pettigrew falsely and misleadingly omitted the fact that Nohl had instructed Metropolis by email to provide fair market value appraisals. Id.

4

- That the Pettigrew affidavit implied that Nohl "improperly influenced the valuation of assets by Metropolis" because in response to a July 3-4, 2015 email request for an appraisal, Metropolis wrote to Nohl, "also please give an idea of what you might need for numbers." Id. at ¶23. The plaintiffs allege that the affidavit claims that this showed that Metropolis was seeking inappropriate and biased input on the valuations, and that the affidavit neglected to state that on July 4, 2015, Nohl had responded to Metropolis, declining to provide any input into the valuations. Id.

- That the affidavit stated that Greenpoint underinsured the mineral assets and stated that "the reported unrealized gains of the gems and minerals held by GP Rare Earth are entirely uninsured," implying that Greenpoint did not believe that its assets were worth what the valuations reflected. Id. at ¶24. The plaintiffs claim that "[o]n information and belief," Pettigrew reviewed insurance documents (including underwriting notes) demonstrating that from December 17, 2015 through at least January 6, 2016, Jewelers Mutual Insurance Company was processing a quote to insure the full value of all assets and that the reason the full value was not insured was that Jewelers Mutual required additional security measures to be installed before it would insure the additional value. Id.

- That the affidavit quoted the December 17, 2015 Jewelers Mutual Underwriting Authority Notes as stating that a terminated employee of GP Rare Earth, William Tumler, said that he was no longer with the company "due to unethical and possible illegal activities" and that "new inventory was inflated and may be a set for a claim or misleading investors." Id. at ¶25. The plaintiffs claim that Pettigrew did not disclose that Jewelers Mutual had contemporaneously performed its own expert review of GP Rare Earth's holdings on December 8 and 9, 2015, and was willing to provide quotes for increased coverage and to continue insuring GP Rare Earth's collection, indicating that it did not credit Tumler's statements and that it had knowledge to the contrary. Id.

The plaintiffs allege that [o]n the basis of the false and misleading Pettigrew Affidavit and other, similar affidavits, this Court and others found probable cause and issued search warrants. Id. at ¶28.

5

C.    <u>Warrant Execution</u>

On March 22, 2017, federal agents raided Greenpoint, GP Rare Earth, Chyrysalis, Bluepoint Investment Counsel, LLC, GAM II and the homes of Hull and Nohl. <u>Id.</u> at ¶1. The FBI seized "thousands of documents as well as computers, gems, fine minerals, and other materials" and "practically the entire fine gem and mineral collection of [GP Rare Earth]." <u>Id.</u> at ¶29. The plaintiffs allege that the seizure prevented Greenpoint and GP Rare Earth from engaging in transactions regarding their gem and fine mineral assets and restricted their ability to conduct business. <u>Id.</u> at ¶30. The plaintiffs allege that they had to spend money to obtain the return of their assets and defend against the investigation. <u>Id.</u> at ¶2. They assert that on March 31, 2017, the U.S. Attorney's Office, through Halverson, "failed to follow this Court's rules for maintaining search warrant affidavits under seal," and that as a result, Pettigrew's affidavit "became public and its false and misleading allegations became the subject of an article in the Milwaukee Journal-Sentinel." <u>Id.</u> at ¶32. They assert that "allowing the Pettigrew Affidavit to become public was a violation of [U.S. Attorney's Office] and/or [Department of Justice] policy and procedure." <u>Id.</u> The plaintiffs assert that the article raised investor questions, which prompted the plaintiffs to communicate with investors regarding the raids; they say that those communications became the subject of inquiry by Halverson, "leading to additional grand jury subpoenas that would not have been issued but for the illegal search and subsequent release of the false and misleading affidavit." <u>Id.</u> at ¶33.

6

The plaintiffs say that between March 22, 2017 and June 1, 2017, the FBI and U.S. Attorney's Office evaluated the provenance and value of the fine gem and mineral assets of GP Rare Earth and that as a result of those evaluations, Halverson ordered all the assets returned, "demonstrating the determination that there was no basis to hold those assets as fruits of or evidence of any crime." Id. at ¶34. None of the plaintiffs or anyone affiliated with them ever have been indicted. Id. at ¶35.

The plaintiffs allege they suffered damages from the invasion of privacy, emotional distress and harm, interference with business relationships and destruction of physical assets. Id. at ¶¶36-37. The plaintiffs further allege

> [t]he loss of income and future earnings by all Plaintiffs; restricted access to credit and loss of pending loans; loss of access to certain tax credits; loss of board representation on at least one closely held company, loss of capital gains through premature liquidation of positions, the costs and expenses of seeking the return of assets from DOJ, responding to subsequent subpoenas, and defending against subsequent DOJ investigative action, and the cost of defending against and settling investor suits arising from and premised on the information contained in the Pettigrew Affidavit.

Id. at ¶38.

The plaintiffs allege a single cause of action, titled "Unlawful Search and Seizure of Property and Belongings." Id. at page 10. The plaintiffs allege that the defendants caused the search of their homes and offices without probable cause and seized assets, violating their established rights under the Fourth Amendment. Id. at ¶39. They further allege that defendants made or caused to be made knowingly and recklessly false statements and representations or material omission of facts in the affidavits for search warrants. Id. at ¶40. The

7

plaintiffs seek compensatory damages, punitive damages and reasonable attorney's fees and costs. Id.

### III. The Parties' Arguments

#### A. Defendants' Motion to Dismiss (Dkt. No. 3)

The defendants argue the court should not extend Bivens to these facts. Dkt. No. 3. They also assert that they are cloaked in absolute and qualified immunity, and that the plaintiffs have failed to state a claim. Id.

First, the defendants argue that the court should not recognize an implied right of action on the facts of this case. Id. at 3. Citing Ziglar v. Abbassi, 137 S. Ct. 1843 (2017), the defendants point out that the United States Supreme Court has consistently refused to extend Bivens to any new context for almost forty years. Id. They explain that courts apply a two-step inquiry to determine whether Bivens liability applies. Id. at 4. They assert that if a court determines that the case does not present one of three Bivens claims approved by the Supreme Court in the past, it then considers whether any special factors counsel hesitation before implying a new cause of action. Id. (citing Abbasi, 137 S. Ct. at 1857-1860).

The defendants argue that no Supreme Court case precisely mirrors this case. Id. at 4. Specifically, they argue that this case is different than Bivens in three respects: (1) the defendants did nothing more than gather, coordinate and regurgitate information; (2) there are intervening steps between the affidavit and the alleged injury (including magistrate judges issuing warrants and executive and judicial branch officials unsealing warrants); and (3) this

8

case presents a greater interference with other branches of government that the facts in Bivens. Id. at 5-6. Further, the defendants argue that Congress has provided a remedial structure, taking steps to prevent the types of injuries allegedly suffered by the plaintiffs. Id. at 7.

As to the second step of the analysis, the defendants argue that there are two factors courts must consider in determining whether to recognize a Bivens claim outside those recognized by the Supreme Court—determining whether there are existing, alternative processes that protect the constitutional right at issue (if so, the court should not imply a Bivens remedy) and if not, whether there are special factors that counsel against a remedy. Id. at 6-7 (citing Wilkie v. Robbins, 551 U.S. 537, 550 (2007); Bush v. Lucas, 462 U.S. 367, 378 (1983). The defendants assert that there are alternative remedies available to the plaintiffs—the Hyde Amendment (which provides attorneys' fees for criminal defendants who prove bad faith on the part of the government), 28 U.S.C. §2255 (which allows a court to vacate, correct or set aside a criminal conviction if it was obtained in violation of the Constitution), the Federal Tort Claims Act (which allows a party to sue law enforcement officers for certain intentional torts). Id. at 7. They argue that even if there were no alternative remedies, recognizing a Bivens remedy here would open federal law enforcement agents and prosecutors to "wide-ranging inquiry" into evidence and investigations. Id. at 8.

The defendants also argue that as a prosecutor, Halverson is absolutely immune from liability for damages for conduct that is functionally

prosecutorial. Id. at 10 (citing Bianchi v. McQueen, 818 F.3d 309, 316 (7th Cir. 2016)). According to the defendants, a prosecutor is cloaked in immunity when reviewing reports and affidavits and signing a search warrant, see Burns v. Reed, 500 U.S. 478 (1991), and appearing in court to present evidence in support of a search warrant application, Van de Kamp v. Goldstein, 555 U.S. 335, 343 (2009). Id. at 11. The defendants argue that even if Halverson assisted with the alleged inclusion or omission of information in the affidavit, he is entitled to absolute immunity. Id.

Third, the defendants argue that Halverson and Pettigrew are protected by the doctrine of qualified immunity. Id. at 12. They assert that officers who knowingly or recklessly submit an affidavit containing falsehoods may be protected if they have an objectively reasonable basis for believing the affidavit still demonstrated probable cause. Id. (citing Archer v. Chisholm, 870 F.3d at 615).

Fourth (and related to qualified immunity), the defendants argue that the plaintiffs have failed to allege or identify any false or misleading assertions. Id. at 14. The defendants point out that the warrant affidavit accurately quotes the underlying discovery and assert that the plaintiffs have failed to allege that any of the information was inaccurate. Id. at 15. The defendants address each of the plaintiffs' allegations, explaining why the statements in the affidavit were neither false or misleading and/or based on the language from the underlying documents. Id. at 15-28. The defendants also argue that the claim regarding damages to the mineral assets fails to state a viable Fourth Amendment claim

because the complaint never alleges that the agents acted in an objectively improper or unreasonable manner when seizing the assets. Id. at 28.

B.  Plaintiffs' Response (Dkt. No. 8)

The plaintiffs respond that this case is not meaningfully different than Bivens itself. Dkt. No. 8 at 5. They assert that Halverson and Pettigrew were "personally involved in setting the search in motion and submitted a false search warrant affidavit, and are therefore much closer to the 'apprehension, detention, and physical searches' of *Bivens*." Id. at 6. The plaintiffs maintain that the only intervening event between the alleged false affidavit and the injuries they suffered were the signatures of the magistrate judges who granted the warrants, and they assert that the defendants conspired to thwart the magistrate judges' exercise of their judicial oversight. Id. The plaintiffs assert that there is no greater risk of interference with other branches of government—they indicate that the court need only review the sufficiency of the search warrant in light of the facts known to the defendants, something courts do frequently in the contexts of Franks motions. Id. at 7 (citing Franks v. Delaware, 438 U.S. 154 (1978)). According to the plaintiffs, if the court takes the defendants' argument to its logical conclusion, no court could ever sanction or hold in contempt a person who submitted a false document to the court. Id.

The plaintiffs next argue that although they do not believe the court must recognize a new Bivens claim under the facts of the case, doing so would be appropriate because there are no existing processes to protect the plaintiffs' constitutional interests. Id. at 8. They argue that the Hyde Amendment

11

protects only those who have been wrongfully convicted (the plaintiffs were not charged or convicted) and the Federal Torts Claim Act provides a remedy only for common law torts, not constitutional violations. Id. They also argue that applying Bivens here would not require this court to interfere in high-level executive policy making, only in a review of search warrant affidavits submitted to this and one other federal court. Id. at 9.

Next, the plaintiffs argue that absolute immunity does not protect Halverson because his role in reviewing and assisting with the search warrants was investigative and advisory—not prosecutorial. Id. at 9. Similarly, the plaintiffs argue against the application of qualified immunity, asserting that they have plausibly alleged that the search warrant affidavit allegations were materially false or misleading. Id. at 11. Specifically, they argue that the defendants knew that investors were not misled, that the appraisals were obtained from those who "purportedly" signed them, that Nohl had instructed Metropolis to provide fair market value appraisals and had refused to provide input into the valuations and that the insurer was willing to insure the assets for full value. Id. at 14-15.

Finally, the plaintiffs insist they have asserted a viable Fourth Amendment claim relating to the damage to the mineral assets. Id. at 18. The plaintiffs assert that they did not allege that the searches were unreasonable because assets were harmed. Id. Rather, they argue that they allege that the searches and seizures were unreasonable because the defendants misled the

12

courts to obtain the warrants. Id. They argue that the destruction of assets is the harm proximately caused by the violation—not the violation itself. Id. at 19.

C.    Defendants' Reply (Dkt. No. 11)

The defendants reiterate that the differences between the facts here and those in Bivens are significant. Dkt. No. 11 at 2. They argue that they are not being sued for conducting a search or effecting a seizure—they are being sued for preparing affidavits used to obtain the search warrants. Id. They assert that the cases that have considered this issue have concluded that this type of information-gathering and case-building activity constitutes a new Bivens context. Id. at 3 (citing Farah v. Weyker, 926 F.3d 492, 498 (8th Cir. 2019); Cantú v. Moody, 933 F.3d 414, 422-23 (5th Cir. 2019); Alvarez v. ICE, 818 F.3d 1194, 1199, 1206 (11th Cir. 2016)).

The defendants assert that the alternative remedies in the context of a criminal proceeding (Hyde Amendment remedies or §2255 remedies) and the civil remedies under the Federal Tort Claims Act—whether practically available to these plaintiffs or not—provide an existing remedial structure. Id. at 4-5. The defendants argue that the fact that Congress considered whether to grant a particular statutory remedy on the issue of officer misconduct and declined to expand it to constitutional violations shows that the court should hesitate to imply a new judicial remedy where Congress has not acted. Id. at 5. They assert that permitting a damages action in this context would require extensive discovery into normally confidential material resulting in a significant intrusion into the executive branch's investigative and prosecutorial functions. Id. at 6.

13

With respect to absolute immunity, the defendants argue that a prosecutor's preparation and presentation of a warrant application is performed in his or her role as an advocate—not an investigator. Id. at 7-8. The defendants further argue that they are entitled to qualified immunity, responding to each of the plaintiffs' individual allegations. Id. at 9-15.

## IV.  Analysis

### A.  Bivens

The Supreme Court has explained that in 1871, Congress passed the statute that became 42 U.S.C. §1983, which entitled an injured person to sue for money damages if an official acting under color of *state* law violated his or her constitutional rights. Ziglar v. Abbasi, ___ U.S. ___, 137 S. Ct. 1843, 1854 (2017). Congress did not, however, create a similar statute entitling individuals to recover money damages if an official acting under color of *federal* law violated the individual's constitutional rights. Id. Against this background, the Supreme Court decided Bivens, 403 U.S. 388.

The plaintiff in Bivens alleged that federal drug agents had entered his apartment, arrested him for alleged drug violations, cuffed him in front of his wife and children, threatened to arrest the entire family, searched the apartment, taken him to the courthouse and interrogated, booked and visually strip-searched him—all without a warrant. Id. at 389. The plaintiff sued, the trial court dismissed the case for failure to state a claim and the court of appeals affirmed. Id. at 390. Before the Supreme Court, the respondents argued that the plaintiff had brought a tort action and that his remedy should

14

be limited to a state-court damages claim. Id. The Supreme Court disagreed. It concluded that "the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen." Id. at 392. The Court held that the petitioner's claim stated a cause of action under the Fourth Amendment and that he was "entitled to recover money damages for any injuries he . . . suffered as a result of the agents' violation of the Amendment." Id. at 397.

Jumping ahead almost forty years, the Abbasi Court described the Bivens decision:

> The [Bivens] Court held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable searches and seizures. See 403 U.S., at 397 . . . . The Court acknowledged that the Fourth Amendment does not provide for money damages "in so many words." Id., at 396 . . . . The Court noted, however, that Congress had not foreclosed a damages remedy in "explicit" terms and that no "special factors" suggested that the Judiciary should "hesitat[e]" in the face of congressional silence. Id. at 396-397 . . . . The Court, accordingly, held that it could authorize a remedy under general principles of federal jurisdiction. See id. at 392 . . . (citing Bell v. Hood, 327 U.S. 678, 684 . . . (1946)).

Abbasi, 137 S. Ct. at 1854. Bivens created what has become known as an "implied cause of action." Id.

The Abbasi Court went on to explain that only twice since deciding Bivens had the Supreme Court recognized implied causes of action involving other constitutional violations—in Davis v. Passman, 442 U.S. 228 (1979) (allowing a former Congressional staffer to bring a Fifth Amendment claim of dismissal based on sex) and Carlson v. Green, 446 U.S. 14 (1980) (allowing a

15

federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment). Id. at 1854-1855. The Abbasi Court recounted that at the time the Court decided Bivens, Davis and Carlson, the Court would, "as a routine matter," imply causes of action to provide remedies not explicit in the statutory text. Id. at 1855. Later, however, the Court "adopted a far more cautious approach before finding implied causes of action." Id.

The Abbasi Court cautioned that "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." Id. at 1856. It speculated that, "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." Id. While emphasizing that Bivens remains good and necessary law, the Court stated that its change in approaching implied causes of action has caused it to make clear "that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." Id. at 1857 (quoting Iqbal, 556 U.S. at 675). The Court observed that for the past thirty years, it consistently had refused to extend Bivens "to any new context or new category of defendants." Id. (quoting Corr. Serv's Corp. v. Malesko, 534 U.S. 61, 68 (2001)).

Just this past year, the Supreme Court declined to find an implied cause of action under Bivens where a federal officer standing on U.S. soil shot and killed a fifteen-year-old Mexican national standing across the border.

16

Hernandez v. Mesa, ___ U.S. ___,140 S. Ct. 735, 743 (2020). The Court previously had been asked to consider the issue but had remanded the case to the court of appeals for reconsideration in light of its then-recent decision in Abbasi. Hernandez v. Mesa, ___ U.S. ___, 137 S. Ct. 2003 (2017). Justice Alito, writing for the 5-4 majority, acknowledged the tension between recognizing an implied cause of action and the Constitution's separation of legislative and judicial power. Hernandez, 140 S. Ct. at 741. He observed that when the court recognizes an implied claim for damages, it "risks arrogating legislative power." Id. Justice Alito explained:

> In constitutional cases, we have been at least equally reluctant to create new causes of action. We have recognized that Congress is best positioned to evaluate "whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government" based on constitutional torts. *Abbasi*, 582 U.S., at ——, 137 S. Ct., at 1856. We have stated that expansion of *Bivens* is "a 'disfavored' judicial activity," 582 U.S., at ——, 137 S. Ct., at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 . . . (2009)), and have gone so far as to observe that if "the Court's three *Bivens* cases [had] been ... decided today," it is doubtful that we would have reached the same result, 582 U.S., at ——, 137 S. Ct., at 1856. And for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens. See* 582 U.S., at ——, 137 S. Ct., at 1863–1864; *Minneci v. Pollard*, 565 U.S. 118 . . . (2012); *Wilkie v. Robbins*, 551 U.S. 537 . . . (2007); *Correctional Services Corp. v. Malesko*, 534 U.S. 61 . . . (2001); *FDIC v. Meyer*, 510 U.S. 471 . . . (1994); *Schweiker v. Chilicky*, 487 U.S. 412 . . . (1988); *United States v. Stanley*, 483 U.S. 669 . . . (1987); *Chappell v. Wallace*, 462 U.S. 296 . . . (1983); *Bush v. Lucas*, 462 U.S. 367 . . . (1983).

Id., 140 S. Ct. at 742-743.

The majority rejected Justice Thomas' suggestion, in his concurring opinion, that the Court should discard the Bivens doctrine altogether. Id. at

750. The dissent emphasized that *Bivens* remains the law of the land even though the Court more recently has declined to extend it to new contexts. Id., 140 S. Ct. at 755.

When the Supreme Court is asked to extend Bivens to new contexts or new defendants, it engages in a two-step inquiry. Id., 140 S. Ct. at 743. First, the court asks whether the claim does, in fact, arise in a "new context" or involve a "new category of defendants." Id. (quoting Malesko, 534 U.S. at 68). The Court's understanding of a "new context" is broad—a context is new if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] court." Id. (quoting Abassi, 137 S. Ct. at 1859). Second, if the claim arises in a new context, the Court asks whether there are special factors that counsel hesitation about granting the extension. Id. "If there are—that is, if [the Court] ha[s] reason to pause before applying *Bivens* in a new context or to a new class of defendants—[the Court] reject[s] the request." Id.

The Supreme Court concedes that it has not tried to create a list of special factors that provide a reason not to extend Bivens; however, the separation of powers principles are central to the analysis. Id. (citing Abbasi, 137 S. Ct. at 1857). In considering those separation-of-powers principles, the Court

> consider[s] the risk of interfering with the authority of the other branches, and [it asks] whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," *id.,* at ——, 137 S. Ct., at 1858, and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed," *id.,* at ——, 137 S. Ct., at 1858.

18

Id.

In 2012, the Seventh Circuit noted that in the prior thirty-two years, the Supreme Court had "reversed more than a dozen appellate decisions that had created new actions for damages" under the implied cause of action theory of Bivens. Vance v. Rumsfeld, 701 F.3d 193, 198 (7th Cir. 2012).

      1.    *Step One—"New Context" or "New Category of Defendants"*

The court first must consider whether the plaintiffs' claim arises under a "new context" or implicates a "new category of defendants" from those in Bivens, Davis or Carlson. The plaintiffs allege that the defendants violated their Fourth Amendment rights when they "made or caused to be made knowingly and recklessly false statements and representations or material omission of facts in an affidavit or affidavits for search warrants which led to the seizure of Plaintiffs' property." Dkt. No. 1 at ¶40. The parties agree that these allegations assert a cause of action most like the cause of action the court recognized in Bivens (as opposed to the causes of action recognized in Davis and Carlson). Dkt. No. 3 at 4. The defendants assert, however, that there are meaningful differences between this case and Bivens, while the plaintiffs argue that their case does not differ meaningfully from Bivens.

The Abbasi Court provided guidance on what the Court meant by "different in a meaningful way" when considering whether a case arises in a new context. The Court explained that

> [i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without

19

endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

Abbasi, 137 S. Ct. at 1859-60. The Hernandez Court added "the risk of interfering with the authority of other branches," as well as whether there are "sound reasons" for Congress to doubt the efficacy or necessity of a damages remedy and whether "'the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" Hernandez, 140 S. Ct. at 743 (quoting Abbasi, 137 S. Ct. at 1858).

The court agrees with the defendants that the claim in this case differs from the claim in Bivens in several meaningful ways. Using the Abbasi Court's examples as a guide, at least one of the "officers" involved in this case differs in rank, and perhaps more significantly, in function, from the officers in Bivens. Halverson is a prosecutor, not a law enforcement agent. His job is not to conduct searches or arrest individuals or even to go out and collect evidence. His job is to review the evidence presented by law enforcement agents like Pettigrew and to determine whether there is sufficient evidence to justify seeking a warrant from a judicial officer. The plaintiffs thus ask the court to

20

extend Bivens to a new category of defendants—prosecutors. This request also is relevant to the separation-of-powers analysis, as the court will explain.

It is true, as the plaintiffs argue, that the constitutional amendment the Bivens defendants allegedly violated and the amendment the plaintiffs allege that Pettigrew and Halverson violated is the same—the Fourth Amendment. But as the defendants note, the nature of the alleged Fourth Amendment violation here differs significantly from the violation in Bivens. The defendants in Bivens entered the plaintiff's apartment, handcuffed the plaintiff in front of his family and threatened to arrest the family and searched the entire apartment—all without a warrant. The defendants here allegedly misrepresented information in affidavits presented to magistrate judges in support of search warrants. While the Seventh Circuit has not had reason to decide whether falsification claims constitute a new context, other courts have found the difference between such claims and the claim in Bivens meaningful enough to decline to conclude that even though the plaintiffs alleged Fourth Amendment violations, the context was new.

In June 2019, the Eighth Circuit decided Farah, 926 F.3d 492. Federal investigators in Tennessee joined a Minnesota sex-trafficking investigation after one victim turned up in Nashville. Id. at 496. The government charged thirty people; nine went to trial and some were acquitted. Id. The district court acquitted others after the jury found them guilty. Id. Five of the defendants sued an officer who had led the investigation, alleging that she had exaggerated and invented facts, hidden evidence that would have exonerated them, deceived

21

prosecutors and manipulated witnesses. Id. at 496-97. The district court allowed the plaintiffs to proceed on a Bivens claim; the Eighth Circuit reversed and remanded with instructions to dismiss the Bivens claims. Id. at 503.

The Eighth Circuit found that the "alleged misdeeds" of the agent in Farah were different from those of the agents in Bivens, "even if the 'constitutional right at issue' [was] the same." Id. at 498. The agent in Farah did not handcuff or strip search anyone or search a residence without a warrant; she "spoke to witnesses, drafted reports and shared information with prosecutors and other investigators." Id. at 498-499. The Eighth Circuit found that "[t]hese information-gathering and case-building activities [were] a different part of police work than the apprehension, detention and physical searches in *Bivens*." Id. The Eighth Circuit also found that "the mechanism of injury" was different because the plaintiff's injuries in Bivens were directly caused by officers' conduct, while in Farah there were intervening steps and decisions by independent actors (the prosecutor, the grand jury and the judges and magistrates). Id. Finally, the court found that recognizing a cause of action under the facts of Farah posed a greater risk of interference with other branches of government than the facts in Bivens because probing the causal chain would involve "delving in the evidence before numerous decisionmakers, including federal investigators, prosecutors, and the grand jury." Id.

Less than two months later, the Fifth Circuit reached a similar conclusion in Cantú v. Moody, 933 F.3d 414 (5th Cir. 2019). The plaintiff in Cantú alleged that the defendant federal agents fabricated evidence against

him. Id. at 421. Like the plaintiffs here, the plaintiff in Cantú argued that his cause of action fell within the ambit of Bivens because he alleged a Fourth Amendment violation. Id. at 422. The Fifth Circuit characterized this argument as "wrong," stating that "[c]ourts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.' *See FDIC v. Meyer*, 510 U.S. 471, 484 n.9 . . . (1994))." Id. After reviewing the examples of meaningful differences in Abbasi, the Fifth Circuit concluded:

> By any measure, Cantú's claims are meaningfully different from the Fourth Amendment claim at issue in *Bivens*. He does not allege the officers entered his home without a warrant or violated his rights of privacy. Rather, Cantú alleges [the agents] violated the Fourth Amendment by falsely stating in affidavits that Cantú willingly took possession of the cooler … to suggest he knowingly participated in a drug transaction … to induce prosecutors to charge him … to cause Cantú to be seized. *See Wilkie v. Robbins*, 551 U.S. 537, 552 n.6 . . . (2007). This claim involves different conduct by different officers from a different agency. The officers' alleged conduct is specific in one sense: They allegedly falsified affidavits. But it's general in another: Cantú claims [the agents] induced prosecutors to charge him without any basis, which led to unjustified detention. The connection between the officers' conduct and the injury thus involves intellectual leaps that a textbook forcible seizure never does. *See Hartman v. Moore*, 547 U.S. 250, 259-62 . . . (2006). "Judicial guidance" differs across the various kinds of Fourth Amendment violations—like seizures by deadly force, searches by wiretap, *Terry* stops, executions of warrants, seizures without legal process ("false arrest"), seizures with wrongful legal process ("malicious prosecution"), etc. This is therefore a new context, and Cantú's claims cannot be shoehorned into *Bivens*, *David*, or *Carlson*.

Id. at 423.

Judge Lee in the Northern District of Indiana came to the same conclusion in Economan v. Cockrell, No. 1:20-CV-32, 2020 WL 6874134 (N.D.

Ind. Nov. 23, 2020). The plaintiffs alleged that the defendants—a DEA agent and a DEA investigator—"presented false evidence for the purpose of seizing the Plaintiff's assets, in violation of the Plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure . . . ." Id. at *24. The plaintiffs argued that Bivens provided them a remedy because their claims, like the claims in Bivens, involved alleged Fourth Amendment violations. Id. Judge Lee found that the plaintiffs' claims of falsified affidavits differed "dramatically" from the facts of Bivens and dismissed the plaintiffs' Bivens claim. Id. at 25, 26.

In a decision pre-dating Farah and Cantú, Jacobs v. Alam, 915 F.3d 1028 (6th Cir. 2019), the Sixth Circuit came to a different conclusion. Following an acquittal, the plaintiffs in Jacobs brought a Bivens action for excessive force, false arrest, malicious prosecution, fabrication of evidence and civil conspiracy. Jacobs, 915 F.3d at 1028. But the Sixth Circuit relied on circuit precedent and concluded that the plaintiff's claims were "run-of-the-mill challenges to 'standard law enforcement operations' that fall within Bivens itself." Id. at 1038. It noted that it had recognized in prior cases Bivens causes of action for all the plaintiff's claims, concluding that the claims did not arise in a new context. Id. In contrast, the plaintiffs have not identified a Seventh Circuit case recognizing a Bivens cause of action for fabrication.

Returning to the Abbasi examples, the court agrees with the Fifth Circuit that while the conduct the plaintiffs identify is specific in some respects in that the plaintiffs allege specific statements in the Pettigrew affidavit which

24

they claim the defendants had reason to know were not true, they are general in the respect that the plaintiffs allege that somehow these allegedly false statements induced other actors, such as magistrate judges, to take actions that eventually led to the searches and seizures of which the plaintiffs complain. A general assertion that the defendants caused others to act in a way they would not have had they had different information is meaningfully different from an allegation that a defendant harmed a plaintiff by humiliating him in front of his family.

The extent of "judicial guidance" involved when a law enforcement officer and a prosecutor seek a search warrant is meaningfully different from the extent of guidance involved in an on-the-scene, warrantless search. In the former scenario, a law enforcement officer submits information to a prosecutor for review to determine whether to seek a search warrant. A magistrate judge reviews—perhaps even questions—the law enforcement officer and the prosecutor before agreeing to issue a search warrant. There are no such layers of review or guidance when officers on the scene choose to execute a warrantless search or arrest.

The risk of disruptive interference by the judiciary into another branch of government is particularly significant in the context of the plaintiffs' allegations. While the plaintiff is correct that the judiciary investigates the veracity of information in a search warrant affidavit in the context of a Franks motion, it does so in the context of its role in enforcing the judicially-created remedy of the exclusionary rule, and the Supreme Court itself emphasized that

the Franks rule is one of "limited scope. Id. at 168. The Court reiterated that there is a "presumption of validity with respect to the affidavit supporting the search warrant." Id. at 171. And a Franks hearing does not require the court to insert itself into the *prosecutor's* role in deciding whether to seek a search warrant—a role that falls squarely within the exclusive function of the executive branch. For the court to allow damages in this context would insert the judiciary into the executive branch's authority to determine when and whether to seek search warrants.

The court concludes that the plaintiffs' claims arise in a new context against at least one new defendant.

2. *Step Two—"Special Factors" Counseling Hesitation About Extending* Bivens

The court next must determine whether to create a damages remedy in this new context. "[A] *Bivens* remedy will not be available if there are "'special factors counseling hesitation in the absence of affirmative action by Congress."' *Carlson*, 466 U.S., at 18 . . . (quoting *Bivens*, 403 U.S., at 396 . . . )." Abbasi, 137 S. Ct. at 1857. The Supreme Court

> has not defined the phrase "special factors counselling hesitation." The necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a "special factor counselling hesitation," a factor must cause a court to hesitate before answering that question in the affirmative.
>
> It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others. It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary

26

to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.

Id. at 1857-58.

The court explained that one factor that might make a court pause is if the "case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." Id. at 1858. Another might be that "some other feature of a case—difficult to predict in advance—causes a court to pause before acting without express congressional authorization." Id. Still another might be where "there is an alternative remedial structure present." Id.

In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

Id.

If the court were to allow a suit for damages against Pettigrew and Halverson, that suit would require the factfinder—either the court via summary judgment or the jury at a trial—to sift through the evidence available to Pettigrew to determine whether the affidavits conflicted with that evidence in any material way. The factfinder then would be required to determine whether any conflict or inconsistency was intentional on Pettigrew's part. If the

27

factfinder determined that Pettigrew intentionally misrepresented information, the factfinder would be required to determine whether Halverson was aware of the intentional misrepresentations and countenanced them, requiring the factfinder to delve into how Halverson evaluated the reliability of the affidavits and how he (and perhaps the U.S. Attorney's Office management) decided whether to submit the affidavits to magistrate judges in support of warrants. Finally, the factfinder would need to determine whether the alleged misrepresentations influenced the magistrate judges' decisions to issue the warrants. As the Eighth Circuit found in <u>Farah</u>, "[t]his type of showing would invite a wide-ranging inquiry into the evidence available to investigators [and] prosecutors . . . ." <u>Farah</u>, 926 F.3d at 500.

The plaintiffs argue that that this is exactly the role courts play in the search warrant process—they review the affidavits in support of the warrant requests and determine whether they are valid and whether they support the issuance of a warrant. Dkt. No. 8 at 9. That argument is true as far as it goes. But a magistrate judge who reviews a warrant application and concludes that it does not support the issuance of a warrant does not assess damages against the affiant or against the prosecutor who supported the application—she refuses to issue the warrant. A judge who conducts a <u>Franks</u> hearing and concludes that the affiant was untruthful does not assess damages against the affiant or the prosecutor who supported the warrant—she excludes the fruits of the search or the arrest.

The plaintiffs' claims—particularly as to Halverson—implicate "the well-recognized principle that prosecutorial discretion is not subject to judicial review." Corsi v. Mueller, 422 F. Supp. 3d 51, 78-79 (citing Wayte v. United States, 470 U.S. 598, 607-08 (1985)).

> The judiciary's deference to prosecutors stems from concerns that judicial oversight would "delay[] the [underlying] criminal proceeding, threaten[] to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, … undermine prosecutorial effectiveness by revealing the Government's enforcement policy," "cause an official to second-guess difficult but necessary decisions," "imapair intelligence gathering[,] and cause sources to close up like a clam." *Wayte*, 470 U.S. at 607 . . .; *Abbasi*, 137 S. Ct. at 1861; *Wilson* [*v. Libby*], 535 F.3d [697], at 710 [[D.C. Cir. 2008]] (quoting *Tenet v. Doe*, 544 U.S. 1, 11 . . . (2005)) (internal quotation marks omitted).

Id. at 79. This is a special factor counseling hesitation.

As the Cantú court noted, another factor counseling hesitation is that while Congress has long known that the Supreme Court does not favor extending Bivens to new contexts, it has yet to create a statutory damages remedy for plaintiffs who allege Fourth Amendment violations by federal agents or prosecutors but are not charged or convicted. See Cantú, 933 F.3d at 423.

The plaintiffs argue that there is no existing remedial framework providing a remedy to a plaintiff whose Fourth Amendment rights are violated without a prosecution ensuing. They point out that the Hyde Amendment provides for an award of attorneys' fees to criminal defendants, but note that because they were not charged, they cannot avail themselves of that relief. Dkt. No. 8 at 8. They note that while 28 U.S.C. §1495 allows wrongfully convicted defendants to sue for damages, they were not charged, much less convicted, so

29

they have no redress there. Id. They argue that the Federal Tort Claims Act provides a remedy only for common law torts, not for constitutional violations, and they argue that they are not alleging (and perhaps cannot allege) any tortious activity. Id.

The Eighth Circuit considered this argument and rejected it. The Farah court found that "far from supporting" the plaintiffs' argument for extension of Bivens, their ineligibility for existing remedies such as the Hyde Act or federal *habeas* relief under 28 U.S.C. §2255 "actually cuts against recognizing a new cause of action." 925 F.3d at 501-502.

> The reason is that it would upset the existing "remedial structure." *Abbasi*, 137 S. Ct. at 1858. These plaintiffs are ineligible for relief under the unjust-conviction statute precisely because they were acquitted or had their charges dropped before trial. But had they been convicted and imprisoned, they would be eligible to seek damages under the unjust-conviction statute. The fact that Congress has expressly provided a damages remedy for some victims of this particular type of injury, but not for others, suggests that it considered the issue and made a deliberate choice. This is a "convincing reason" not to imply a second, distinct "freestanding remedy in damages." *Id.* (citation omitted).

Id. at 502. "Congress's decision not to provide a judicial remedy does not require [the courts] to step into its shoes." Hernandez, 140 S. Ct. at 750. "The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." Id. (quoting Schweiker v. Chilicky, 487 U.S. 412, 421-11 (1988)).

Perhaps Congress has not acted because it considers situations such as the plaintiffs'—where the searches result in no charges and the return of the

30

seized property—to be infrequent. Perhaps it has not acted out of a desire to avoid chilling zealous investigation and prosecution. Perhaps it has not acted because it perceives that state tort remedies are sufficient. Whatever the reason, it is not the role of the court to create a damages remedy in the vacuum Congress has left.

Before closing, the court acknowledges that in Lanuza v. Love, 899 F.3d 1019 (9th Cir. 2018), a decision issued post-Abbasi but pre-Hernandez, the Ninth Circuit found that while a claim against an ICE attorney who forged an immigration document arose in a new context, there were no special factors counseling hesitation in extending Bivens to that context. Id. at 1030. The Lanuza court focused on the fact that the plaintiff had sued a single, low-level government attorney and was not seeking to hold high-level policy makers to account. Id. at 1028-29. The same is true here—the plaintiffs sue an individual agent and an individual prosecutor, not the FBI or the Attorney General. The court found that expanding Bivens to the new context of an immigration officer forging a document did not threaten the political branches' supervision of national security or foreign policy. Id. The same is true here—the plaintiffs' claims do not implicate the executive or legislative oversight of national security or foreign policy. The Lanuza court found that the case had not garnered executive or legislative attention, id.; to the court's knowledge, neither has this case. But the Lanuza court also concluded that the language of the Immigration and Nationality Act showed that "Congress contemplated that civil actions would be maintained against both federal immigration officers and

state employees acting in the capacity of federal immigration officers when their actions allegedly violate the Constitution or other laws." Id. at 1031. There is no statute demonstrating such contemplation by Congress for federal law enforcement agents or federal prosecutors who make or condone false statements in relation to obtaining search warrants.

Given the strong language in Abassi and Hernandez counseling against an extension of Bivens and the reasoning of the Fifth and Eighth Circuits in applying Abassi to fabrication claims, the court declines to extend Bivens to the facts of this case. Because the court declines to extend Bivens to the plaintiffs' claims, it will not address the defendants' affirmative defenses of absolute immunity (Halverson) and qualified immunity (Pettigrew and Halverson).

## V. Conclusion

The court **GRANTS** the defendants' motion to dismiss. Dkt. No. 2.

The court **ORDERS** that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 9th day of February, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

32